# CHARLESTON.

## STATE *v.* DALLAS WILSON.

Submitted February 12, 1924.   Decided February 19, 1924.

1. HOMICIDE—*Instruction as to Murder in First Degree Held Not Erroneous.*

    Where the evidence in a trial for murder shows that defendant and deceased, on the afternoon of the day of the homicide had engaged in an altercation resulting in a fist fight engendering ill feeling, and later about 9 o'clock P. M. they met on the porch of a restaurant in a public place, and after a spirited talk went out into the darkness of the street in front of the restaurant, the deceased preceding defendant, the latter upon reaching the street arming himself with a rock there found and then disappearing in the darkness in the direction taken by deceased, a short time thereafter returning to the lighted portion of the street where he was seen to throw down two rocks; and returning to the porch informed a witness that deceased would not again follow him around or bother him any more, that he, deceased, was lying out there on the gravel pile; that deceased was then found where indicated, dying from a wound on the back of his head near the base of the brain; that defendant a few minutes afterwards stated to other witnesses that deceased had called him a vile name, but would do so no more, that he had hit deceased with a rock, with what result he did not know, but he had left him lying on a gravel pile; it is not error to give instructions, properly drawn, telling the jury that if they believe from the evidence beyond a reasonable doubt that the fatal blow was given wilfully, deliberately and premeditatedly without justification, excuse, palliation, or alleviation, defendant was guilty of murder in the first degree.   (p. 530).

2. SAME—*Instruction as to Existence of Malice and Presumption as to Consequences of Acts Held Not Erroneous.*

    Nor in such case is it error to instruct the jury as to the length of time in which malice may have existed before the homicide; and that a man is presumed to intend what he does or which is the necessary consequence of his act; and that if they believe that the homicide was committed with a deadly weapon without any or upon slight provocation defendant is *prima facie* guilty of deliberate and premeditated killing, and the necessity rests upon him to show extenuating circumstances or they must appear from the circumstances of the case. (p. 530).

3.  SAME—*Existence of Malice at Time of Homicide Question for Jury.*

    In such case it is a question for the jury to determine whether malice existed in the heart of defendant at the time of the homicide and it is not error to give instructions properly embodying the law where malice exists in the commission of a homicide, and the degree of crime flowing therefrom. (p. 532).

4.  CRIMINAL LAW—*Instruction Properly Propounding Law on Fact Supported by Evidence Not Erroneous.*

    Where there is evidence tending to prove a fact, not merely colorable, an instruction properly propounding the law applicable to the fact, if the jury finds it to exist from such evidence, may be given. (p. 532).

5.  SAME—*Abstract Instructions Should Never be Given; Instructions Should Propound Law Applicable to Proven Facts, or Which Evidence Tends to Prove; Giving of Abstract Instructions, Inapplicable to Facts, Not Reversible Error, Unless Misleading.* (p. 534).

    Instructions in the abstract, should never be given. Instructions should propound the law applicable to the facts proven, or which the evidence tends to prove. Generally, where abstract instructions have been given without direction or suggestion of applicability to the facts, it will not be reversible error unless it is apparent that the jury was, or might have been, misled thereby. (p. 534).

Error to Circuit Court, Jackson County.

Dallas Wilson was convicted of voluntary manslaughter, and he brings error.

*Affirmed.*

*J. L. Wolfe,* for plaintiff in error.

*E. T. England,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

LIVELY, JUDGE:

From a verdict of voluntary manslaughter and a sentence of confinement in the penitentiary for three years, defendant prosecutes this writ.

He was indicted for the murder of Everet Williams, who was killed Sunday night the 3d day of June, 1923, in the street, Cottageville, Jackson county, in front of the restaurant

of Cora Price. Defendant was between seventeen and eighteen years old at the time of the homicide and weighed about 122 pounds. Williams, the deceased, was about nineteen years old and weighed about 170 pounds. The immediate circumstances surrounding the homicide, as gathered from the testimony of those present, are substantially as follows: These two young men met on the front porch of the restaurant of Cora Price, about 9 o'clock on Sunday night, the 3d day of June, 1923. There were several persons congregated in front of the restaurant, which was lighted from within, the light coming through the windows and the door when open, and imperfectly lighting up the street in front, which street was in the process of being hardsurfaced, and several piles of gravel had been placed therein. A few feet distant from the porch was the side walk and between the side walk and curb was earth designed for a strip of grass. The night was dark. Defendant had been at church, and the deceased was at the restaurant when he arrived. A conversation, somewhat animated, occurred between them, but the witnesses did not hear what was said, or at least they would not tell what was said. The witnesses for the state did not remember, or did not want to remember, all that occurred on that occasion. After this conversation Williams left the restaurant porch and went out into the street, first into the semi-darkness, and then into the darkness, and was followed by defendant a short distance behind. One of the witnesses, Arthur Smith, says he saw defendant pick up a rock from the sidewalk or from the space between the sidewalk and the curb, and carried it with him into the darkness. Several rocks were thrown from the street, and struck the pavement near the restaurant. No witness knew whence they came or by what agency thrown. They heard no words spoken from the darkness and saw nothing of what occurred, although all of them seemed to understand that a fight was in progress. In their testimony they unconsciously or unguardedly referred to a fight in progress. Information that trouble was on hand or a fight was in progress was received by those in the restaurant from without, and one or two witnesses came from within to ascertain what was going on. Defendant was seen as he came from the dark-

ness into the light thrown into the street through one of the
windows, to throw two stones down upon a gravel pile which
he was passing. One witness, William Hicks, testifies to this
fact. Defendant then approached those at the restaurant and
remarked to witness Gatchel that he had left him lying on
the gravel pile. This is the substance of what is detailed of
his remarks. The crowd then proceeded beyond the gravel
pile, a very short distance from the porch, and found Wil-
liams lying on the gravel pile with frothy blood coming from
his mouth, unconscious, with a severe contusion or abrasion on
the back of his head near the base of the brain, swelled to
about the size of a hen's egg. A doctor was sent for, the
unconscious young man was carried to the doctor's residence
a short distance away, where he received medical attention
and where he died two or three hours afterwards from the
effect of the wound in the back of his head. About 12 o'clock
that night defendant was arrested at his home in the sub-
urbs of the town, where he had retired and had gone to sleep.
Upon being asked by his mother in the presence of the officers,
after she had ascertained the cause of his arrest, as to what
made him commit the act, he replied to her, according to his
and her testimony, that Williams had attacked him with a
knife and he had hit him with a rock in self defense. It
appears that when Williams was discovered near the gravel
pile in a critical condition, defendant left the scene and went
toward his home. On his way he came to another restaurant
known as Blagg's restaurant, beyond the bridge over a small
stream which runs through the town, where he entered into
conversation with those present; two or three persons there
testified that he told them that Williams would not revile
him any more for he had left him lying in the street and
didn't know what he had done to him. These witnesses say
he told them that he had thrown a rock at him, or a gravel,
or something of that kind. Defendant denies that he picked
up a rock near the restaurant when he left the porch. He
denies that he threw two rocks down on the gravel pile as
he came back out of the darkness. He denies that he told
the witness when he came back that he had struck Williams
and that they would find him lying in the street. He denies

the alleged conversation with the witnesses at Blagg's restaurant. His version of the unfortunate occurrance is that on the evening of the homicide he was in a boat on the stream near the bridge, on which Williams stood, and who then threw stones at him and a companion in the boat; that after he got out of the boat and came up on the bridge an altercation occurred between them which resulted in a fist fight of no consequence and from which they desisted after mutually exchanging two or three blows; that he saw Williams Saturday night about 11 o'clock at a barber shop, and they threw dirt or gravel at each other in a boyish spirit; that on the following Sunday night, the night of the homicide, he went to church services in the village, arriving there while the opening prayer was in progress, and that he again saw Williams who called him a vile name in a threatening manner, but he, defendant, left him, prayer being over, and entered the church, seeing nothing more of Williams until he discovered him sitting on the front porch of Cora Price's restaurant when Williams again accosted him and called him a vile name. He says that a short time after this conversation Williams left the porch and went into the darkness across the street, as he supposed, to leave for home, and that he, defendant, some ten or fifteen minutes after Williams left, started across the street in a diagonal direction to obtain a drink of water; and while crossing the street stumbled over some obstruction and as he arose Williams came at him with a knife in his hand and threatened to disembowel him, whereupon he immediately fled in the darkness and as he passed a gravel pile picked up a gravel, whirled and threw it at his assailant, who came on a short distance, whirled and went back; he then returned to the restaurant not knowing his assailant had been hurt. As above stated, he denies having a conversation with those at the restaurant upon his return, denies that he knew that Williams was hurt; admits telling those at Blagg's restaurant that he threw a rock "but didn't know where it hit." From there he went home and retired, where the officers found him and arrested him and where his mother asked him why he had done the deed of which he was accused and he told why he had thrown the gravel. He says he acted in

self defense, first fleeing from and then repelling a vicious attack, and that he did so believing that he was in danger of great bodily harm at the hands of his assailant. He pleads self defense.

From defendant's own statement, as well as the testimony of other witnesses, it is apparent that there was some ill feeling existing between these two boys, resulting from the fist fight on the bridge and continuing until the time of the homicide. The use of the vile names and threatening attitude of deceased toward defendant indicate his mental attitude; and the readiness of defendant to repel insult and to engage in physical combat indicates his mental attitude. The meeting at the porch of the restaurant resulting in the animated conversation, which one of the witnesses says was "not exactly quarreling," culminated in the fight in the darkness of the street. The jury could well determine from this evidence that neither of the young men was free from blame, and that the combat was mutual, the deceased unfortunately receiving a fatal injury, which, of course, was not intended. The rash impetuosity and readiness to accept personal combat so characteristic of unthinking youth is well known to the ordinary juror.

The grounds of error are that the court admitted evidence and refused to admit evidence both prejudicial to defendant; but this ground is not insisted upon, and we perceive no error in that regard. The main point of error relates to the giving of instructions on behalf of the state. The state prosecuted on the theory that the murder was wilful and deliberate and with malice aforethought, and the first and second instructions given embody that theory and tell the jury that if they believe beyond all reasonable doubt that the defendant wilfully, deliberately and premeditatedly, with malice aforethought, struck the deceased with a stone on the head, from which he died, without justification, excuse, palliation or alleviation, then defendant was guilty of murder in the first degree; and that there was no particular period during which it was necessary that malice should have existed or the defendant should have contemplated the killing. It is insisted by counsel for the defense that these instructions should

not have been given, because the evidence of malice or pre-meditation is not sufficient on which to base them under our cases of *State* v. *Laura,* 93 W. Va. 250, 116 S. E. 251; and *State* v. *Hurst,* 93 W. Va. 222, 116 S. E. 249. We think there is evidence sufficient on which the jury could have found that malice existed at the time of the killing. The use of a deadly weapon without any or upon very slight provocation, result-ing in the homicide, imports malice, and in such case extenu-ating circumstances must be shown by the defendant or it must appear from all of the evidence and circumstances. The ill feeling existing for a day (an altercation, almost a fight having occurred on Saturday), the readiness to engage in the combat, and the preparation therefor by picking up a rock a few minutes prior thereto, thus arming himself with a deadly weapon, would justify the giving of these instruc-tions. The jury, by its verdict, has said that no malice ex-isted. The distinguishing feature between murder and man-slaughter is that murder comes from the wickedness of the heart, and manslaughter, where voluntary, arises from the sudden heat of passion. All homicide is prima facie murder in the second degree, and is presumed by law to be malicious, wherefore the burden is on the defendant to show justification or excuse and it may be shown by his evidence or by that of the state. And even where the act though intentional of death was not the result of deliberation and premeditation, as when it is the result of sudden heat of passion and hot blood, then the presumption of malice may be rebutted if the death is the result of reasonable provocation. "When a homicide is com-mitted in the course of a sudden quarrel or broil, or mutual combat, or upon a sudden provocation, and without any pre-vious grudge, the offense may be murder or manslaughter, according to the circumstances of the case. Of which cir-cumstances the most important generally, are the nature and degree of the provocation; the manner in which it was re-sented; the character of the weapon used for the purpose, and whether it was casually or accidentally at hand, or was prepared for the purpose of doing such an act and carried secretly about the person." *Read* v. *Com.,* 22 Gratt. 924. Under the circumstances detailed it was a question for the

jury to determine whether or not there was malice, or sufficient provocation to reduce the killing from murder in the first or second degree to manslaughter. In tender consideration of the frailty and impetuosity of youth and human infirmity, the jury has concluded that the homicide was committed from sudden transport of passion and heated blood and upon reasonable provocation without malice. Of course, they might have found him not guilty under his theory of self defense, for if they believed his story, which was not very persuasive, he was acting under sudden peril in repelling a dangerous and vicious assault upon his life. It may be observed here that no knife was found either in the clothes of the deceased or in the street.

The third instruction is to the effect that a man is presumed to intend that which he does, and if the defendant with a deadly weapon in his possession, without any or upon very slight provocation, gave the mortal wound, he is *prima facie* guilty of wilful and premeditated killing, and the necessity rests upon him of showing extenuating circumstances either from the evidence and circumstances of the case, whether introduced by him or the state, and if these extenuating circumstances do not appear, and he can not reduce the *prima facie* presumption of malice, he would be guilty of murder. We find no error in this instruction.

The fourth instruction is of like import, and tells the jury that if they believe that the deceased came to his death by a stone thrown by defendant, the presumption is that it is murder in the second degree; and if the state would elevate it to murder in the first degree she must establish the characteristics of that crime, and if the prisoner would reduce it to manslaughter or an acquittal the burden rests upon him.

Instruction No. 5 in substance tells the jury what the law requires of one who has committed homicide, where he has provoked the quarrel which resulted in the tragedy; that before such person would be justified in committing the homicide he must cease the combat and retreat as far as safety will permit before he could take the life of the other combatant, in order to justify himself on the ground of self defense. The objection to this instruction is that there is no evidence

on which to predicate it; that is, that there is no evidence that defendant provoked a quarrel. It is true, the evidence on that point is slight, but we think there is enough to justify the instruction. The quarrel and ill feeling had existed for some time, and the fight was the culmination of it. On the Saturday night before, at the barber shop, defendant was the aggressor by throwing dirt in the face of deceased while he was sitting at the window of the barber shop, and although it is stated that this incident was the result of boyish fun, it was followed very closely by an altercation which occurred between the boys over some pictures that night while on their way home when, it is in evidence, that defendant threatened to kill deceased with a club because deceased would not return to him the pictures. And one witness, Rufus Loyd, said defendant remarked on Sunday, that if Williams had come up to him on Saturday, he, defendant, would have killed Williams. Defendant was then relating the trouble over the pictures. While the meeting on the porch of the restaurant and what occurred there is not very definite, the whole circumstances are enough to show that the jury might have concluded that defendant was not altogether without fault.

Instruction No. 6 correctly propounds the law where both parties are at fault, where there is a mutual quarrel and a combat follows, resulting in death. The objection to this is that there was no mutual quarrel shown. As before observed, the jury could well determine that both were at fault and that the quarrel and resulting combat were mutual.

Instruction No. 7 tells the jury that a conviction may be based on circumstantial evidence alone; that such evidence is competent and if from it the jury believe to a moral certainty and beyond a reasonable doubt that defendant committed the crime they may base a conviction thereon. The objection to this instruction is that it was inapplicable and would tend to mislead the jury. There is an element of circumstantial evidence in this case. The actual commission of the crime was in the dark, and it is only from the circumstances immediately surrounding it that the jury could come to the conclusion that the mortal blow was given by defend-

ant and not by an assault at the hands of some other person. The fatal blow was in the back of the head near the base of the brain, while the evidence of defendant is that he threw a gravel at the deceased while he was approaching him with a knife in his hand and in order to repel the viciousness of the assault. Of course, if this evidence of defendant be true, the throwing of that gravel could not have caused the injury. It would be difficult to hit a person in the back of the head with a rock, who was making a frontal attack with a knife in his hand. The circumstantial evidence repels the evidence of defendant, and we can not see where the jury could have been misled by this instruction.

While there is formal objection to Instruction No. 8, it is not insisted upon as erroneous in the brief of counsel for defendant. It relates to the weight which the jury may give to the evidence concerning the statements made by deceased to the witnesses immediately after the homicide was committed.

The last instruction is not without difficulty. It is to the effect that where a party has the power to produce a witness to prove a particular fact and does not do so, the presumption is that the witness, if his testimony had been produced, would be unfavorable to the party having it in his power to call him. The criticism of this instruction is that the record discloses that no one could have been called as a witness who was not introduced, and therefore is misleading and would tend to create in the minds of the jurors the impression that defendant had some witness to a material fact whom he did not produce. We have carefully examined the record to see if there was any witness who could have been produced either by the state or defendant to a material fact, who was not called, and we have failed to find any. What particular evidence was in the mind of the prosecution when this instruction was given is not disclosed, and none is pointed out in the brief of the state. That assignment of error is dismissed by the state by saying: "No comments are necessary as to the correctness of instructions 8 and 9." Instruction No. 9, it is true, is correct as an abstract proposition of law, but its applicability to the case is the gravamen of the complaint

against it.   If this be error, and we are inclined to think it is, could the jury have been misled thereby to the prejudice of the prisoner?   Is it harmless error?   So far as we can see every witness who had any connection with the case and whose· evidence would have been material, was summoned, examined and cross examined.   Instructions are given as the instructions of the court, and the jury does not know whether they are proposed by the prosecution or the defense.   This instruction from its reading would apply to the state as well as to the defendant, and is abstract.   It is well settled that instructions which announce abstract propositions of law, however correct, should not be given when there is nothing in the case upon which they could be based.   *Bailey* v. *England,* 10 Gratt. 236; *State* v. *Allen,* 45 W. Va. 65; *State* v. *Prater,* 52 W. Va. 132.   Where an instruction is abstract and has no basis in the evidence it should be refused by the court, but generally it is not held as a sufficient cause for reversal. *Hunter.* v. *Jones,* 6 Rand. 41.   A reversal will not be given because of an abstract instruction unless it can be seen that it has misled or might have misled the jury.   *Read* v. *Com.,* 98 Va. 817.   We can not see that this instruction was misleading, or prejudical to defendant.   No witness could have been called by either party who saw the actual affray which occurred in the dark; no evidence from any one not produced is perceived which could have changed the conclusion that the unfortunate homicide was committed in hot blood, and with sufficient provocation and alleviation to rebut the presumption of malice.   The punishment is severe in consideration of the tender years of defendant; but the severity of the punishment is entirely within the discretion of the trial court, and we can not change it.   That is a matter which would be addressed to the mercy of the pardoning power.

*Affirmed.*