370 S.E.2d 336

**STATE of West Virginia**

v.

**Thomas MYERS.**

**No. 17666.**

Supreme Court of Appeals of West Virginia.

May 27, 1988.

---

Randall C. Levine, David R. Rexroad, Buckhannon, for appellant.

Silas Taylor, Deputy Atty. Gen., Charleston, for appellee.

PER CURIAM:

The defendant, Thomas Myers, was convicted of first degree murder in the Circuit Court of Lewis County, and was sentenced to life imprisonment with mercy. On appeal, he cites as error the admission of evidence concerning two scientific experiments which the State failed to disclose in pretrial discovery.[1] We conclude that the defendant was not prejudiced by the nondisclosure, and affirm the conviction.

Early on the morning of February 4, 1985, the defendant summoned a neighbor to his mobile home in rural Lewis County. As he entered the home, the neighbor saw

---

1. The defendant also asserts that the principles which underlie the experiments are unreliable and are not generally accepted within the scientific community, as required by *State v. Clawson*, 165 W.Va. 588, 270 S.E.2d 659 (1980). In a related vein, he argues that the tests were not conducted under conditions which "were substantially similar to the original conditions sought to be recreated...." Syllabus Point 5, in part, *State v. Kopa*, 173 W.Va. 43, 311 S.E.2d 412 (1983). These issues were not preserved by a proper objection below and we, therefore, decline to address them. *State v. McFarland*, 175 W.Va. 205, 332 S.E.2d 217 (1985); *State v. Byers*, 159 W.Va. 596, 224 S.E.2d 726 (1976).

the defendant's girlfriend, Beverly Lynn Barnes, lying on the floor inside the door. Her clothes were bloody, and a .22 caliber pistol rested within inches of her hand. The authorities were promptly notified, and the victim was pronounced dead at the scene.

A post mortem examination determined the cause of death to be a bullet wound which extended from the victim's upper lip into the brain. Also remarkable were prominent bruises and abrasions on the victim's head, abdomen, and lower extremities. Fine black soot, identified as gunpowder residue, was present on the left cheek and on the palm of the left hand.

The defendant was questioned about the shooting by the police, and provided a written statement at 5:45 a.m. He said the victim had wanted to assist an ex-boyfriend in a custody battle. The defendant disapproved and a fight ensued, during which he shoved the victim and struck her with his hand. She threatened to move out of the home and went into the bedroom to pack her clothes. Later, she walked out of the bedroom and said: "I'm going to end it all." The defendant heard a "muffled noise," looked over at her fallen body, and telephoned a neighbor for assistance. He emphasized in his statement that only one shot was fired.

The State's theory, as developed at trial, was that the defendant killed the victim during a fight. Much of the circumstantial evidence tended to support that theory. The victim's body was bloody and badly bruised. Some of the victim's blood was discovered on the defendant's clothes. Various household items were broken and strewn throughout the interior of the home. Further, gunpowder residue on the victim's hands was said to be consistent with a defensive, not offensive, handling of the pistol.

As a component of its theory of the case, the State sought to prove that two shots were fired, the second of which was by the defendant's intervention. It admitted into

evidence a spent bullet which was retrieved from the floor of the mobile home. However, forensic experts were unable to identify the caliber of the bullet or to determine when it was fired. Of more importance to the State's case were the results of two scientific experiments which will be described in detail below.

On April 4, 1986, over a week before trial, the State's expert, James L. Frost, M.D., performed an experiment which involved two-dimensional cardboard cutouts. This experiment attempted to reproduce on the cutouts the pattern of powder deposited by the pistol. Dr. Frost fired the pistol at variable distances and angles, and compared the powder patterns with that on the victim's face. He reached two conclusions: that the pistol was fired from a distance of one to two inches, and that the powder on the victim's cheek was from a second gunshot.

Another experiment, referred to by the parties as the "white glove" experiment, was performed on the same day. With the aid of his autopsy notes, Dr. Frost reproduced with black marker the powder pattern which appeared on the victim's left palm. He placed a white rubber glove on his left hand and fired the pistol using a variety of hand configurations. He was unable to duplicate the powder pattern, and concluded that two shots had been fired.

The results of Dr. Frost's two experiments were not disclosed to the defendant in response to a prior discovery motion. Counsel for the defendant did interview Dr. Frost after the experiments were completed, apparently on April 8, 1986.[2] At that interview, defense counsel did not inquire into any recent experiments which might have been performed.

On April 11, 1986, Master Sergeant C.R. Lane, a police forensic specialist, repeated Dr. Frost's "white glove" experiment. A sample glove was provided by Dr. Frost which outlined the powder pattern in black marker. Sergeant Lane fired sixteen rounds, some with rubber gloves and oth-

---

**2.** At trial, it was represented by the parties that the interview took place on April 4, 1986. The State, by letter of February 17, 1988, now stipu-

lates that the date of the interview was actually April 8, 1986.

ers with bare hands. He, too, concluded that the patterns which appeared on the victim's hand could be produced only by two shots. A forensic report of even date was prepared and a copy provided to the defendant by United States mail. This report was received by the defendant on April 14, 1986.

Trial commenced at 9:15 a.m. on April 14, 1986, and Sergeant Lane took the stand on April 16, 1986. When the State moved to admit Sergeant Lane's forensic report, the defendant objected due to an inadequate foundation.[3] This objection was sustained. Dr. Frost provided the required foundation the next day, and the report was admitted without objection. No defense objection was made to any of Sergeant Lane's opinion testimony.

Dr. Frost was called as a witness for the State on the afternoon of April 16, 1986. The defendant objected to all testimony relative to Dr. Frost's experiments since the results had not been disclosed by the State. He did not move for a continuance. The circuit court *sua sponte* ordered a recess until the next day, and directed the State to provide the defendant with the results and to permit the defendant and his attorney to confer with Dr. Frost. The defendant renewed his objection the next day. The court overruled the objection, and concluded that the defendant was not prejudiced by the evidence due to his review of the experiment results and conference with Dr. Frost.

The defendant's primary contention on appeal is that the State's failure to timely disclose the results of Dr. Frost's experiments violated Rule 16(a)(1)(D) of the West Virginia Rules of Criminal Procedure.[4] He further contends that the admission of the results and testimony concerning the experiments constituted reversible error.

The State appears to concede the untimely disclosure, but contends that the defendant was not prejudiced.

■ Under West Virginia common law, the State's untimely compliance with a defense discovery motion warranted the reversal of a conviction only if the defendant was prejudiced. We said in Syllabus Point 2 of *State v. Grimm*, 165 W.Va. 547, 270 S.E.2d 173 (1980):

> "When a trial court grants a pre-trial discovery motion requiring the prosecution to disclose evidence in its possession, non-disclosure by the prosecution is fatal to its case where such non-disclosure is prejudicial. The non-disclosure is prejudicial where the defense is surprised on a material issue and where the failure to make the disclosure hampers the preparation and presentation of the defendant's case."

We pointed out in *State v. Miller*, 178 W.Va. 618, 363 S.E.2d 504 (1987), that with the adoption of the Rules of Criminal Procedure in October, 1981, *Grimm*'s requirement of prejudice remained applicable under Rule 16. We held in Syllabus Point 4 of *Miller:*

> "Our traditional appellate standard for determining whether the failure to comply with court ordered pretrial discovery is prejudicial is contained in Syllabus Point 2 of *State v. Grimm*, 165 W.Va. 547, 270 S.E.2d 173 (1980). This was evolved prior to the adoption of our Rules of Criminal Procedure, but is applied to Rule 16 discovery."

We thus direct our attention to the two aspects of prejudice laid out in *Grimm:* (1) surprise, and (2) impairment of trial preparation and presentation.

---

**3.** Specifically, the defendant objected that the reliability of the powder outlines on the sample glove provided by Dr. Frost could not be demonstrated by Sergeant Lane's testimony.

**4.** Rule 16(a)(1)(D), W.Va.R.Cr.P., provides:
   "Reports of Examinations and Tests.—Upon request of the defendant the state shall permit the defendant to inspect and copy or photograph any results or reports of physical or

mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the state, and which are material to the preparation of the defense or are intended for use by the state as evidence in chief at the trial."

█ The defendant's position is straight-forward. He emphasizes the circumstantial nature of the State's case and the importance of the State's scientific evidence in support of its theory. As he rightly points out, the results of Dr. Frost's experiments were not made available for the defendant's review until the day of Dr. Frost's testimony. He, therefore, asserts that he was surprised by the evidence, and was unable to replicate the experiments or to effectively attack their validity.

Other factors, however, strongly militate against a finding of prejudice. With respect to the "white glove" experiment, it is significant that Sergeant Lane performed an identical procedure on April 11, 1986, and disclosed the results to the defendant that very day. A report which summarized the experiment, as well as Sergeant Lane's opinion testimony, were admitted without objection. It is thus apparent that evidence of the "white glove" experiment was already properly before the jury in advance of Dr. Frost's testimony.

Lack of prejudice is even more pronounced as to the cardboard cutout experiment. Ten months before trial, Sergeant Lane performed a related experiment with three-dimensional mannequin heads. His conclusion, like Dr. Frost's, was that the powder pattern on the victim's cheek was the product of two shots. The results of Sergeant Lane's experiment and his conclusions were in the hands of the defendant well in advance of trial. Further, testimony by the defendant's forensic expert reveals that he, too, had performed an experiment with cutouts and had reached similar results. He used the Frost cutouts for reference, and opined that the powder residue on the victim's cheek was part of an ordinary "T-bar" pattern produced by a single gunshot. Dr. Frost's experiment was, therefore, far from prejudicial and was actually incorporated into the defendant's theory of the case.

█ Even assuming some prejudice lingered, it was cured by the judge's decision to recess before Dr. Frost was permitted to testify concerning the experiments. We took pains to point out in *Miller* that Rule 16(d)(2),[5] W.Va.R.Cr.P., provides flexibility to judges in meeting late discovery problems, and stated in Syllabus Point 5:

> "Rule 16(d)(2) [of the West Virginia Rules of Criminal Procedure] enables a trial court to impose sanctions that may have the effect of curing a late discovery problem."

One of the methods by which a judge may prevent prejudice, as recognized by many cases, is by ordering a continuance or recess.[6] As we commented in *Miller*, 178 W.Va. at 625, 363 S.E.2d at 511, Rule 16 requires the judge to inquire into "the feasibility of rectifying ... prejudice by a continuance[,] or recess if the trial has begun...." (Brackets and footnote omitted).

Here, the judge wisely recessed until the next day to permit the defendant to review the results of Dr. Frost's experiments. He also required the State to make Dr. Frost available to discuss the experiments and results with the defendant. This procedure enabled the defendant to familiarize himself with the evidence and to fairly meet it at trial. We, therefore, conclude that the defendant was not prejudiced by the untimely disclosure of the experiments by the

---

5. Rule 16(d)(2), W.Va.R.Cr.P., provides:

"Failure to Comply with a Request.—If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances. The court may specify the time, place and manner of making the discovery and inspection and may prescribe such terms and conditions as are just."

6. In *Miller,* 178 W.Va. at 625 n. 16, 363 S.E.2d at 511 n. 16, we cited the following state and federal cases which recognize a recess as an appropriate Rule 16 sanction. *United States v. Euceda–Hernandez,* 768 F.2d 1307 (11th Cir. 1985); *Gorham v. Wainwright,* 588 F.2d 178 (5th Cir.1979); *United States v. Pineros,* 532 F.2d 868 (2d Cir.1976); *Robinson v. State,* 450 N.E.2d 51 (Ind.1983); *State v. McClintick,* 315 N.C. 649, 340 S.E.2d 41 (1986).

State.[7]

For the reasons stated above, the judgment of the Circuit Court of Lewis County is affirmed.

Affirmed.

---

**7.** Two other errors cited by the defendant are without merit. The defendant contends the evidence presented was insufficient to sustain a conviction. We conclude the State's evidence was sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt. *State v. Starkey,* 161 W.Va. 517, 244 S.E.2d 219 (1979).

The defendant also objects to State's Instruction No. 6, which defined the requirements of premeditation. It stated, in part, that "it is only necessary that such intention [to kill] should come into existence for the first time at the time of such killing[,] or at any previous time thereto." The defendant, relying upon *State v. Hatfield,* 169 W.Va. 191, 286 S.E.2d 402 (1982), contends the instruction blurred the distinction between first and second degree murder. We believe that the instruction, when "fitted with others in the case," 169 W.Va. at 203, 286 S.E.2d at 410, satisfactorily apprised the jury of the distinction. Another instruction properly explained the necessity of premeditation to convict of first degree murder.