332 S.E.2d 217

**STATE of West Virginia**

v.

**John Patrick McFARLAND.**

No. 16011.

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 29, 1985.

Decided June 18, 1985.

Steven M. Askin, Askin, Pill, Scales & Burke, Martinsburg, for appellant.

S. Clark Woodroe, Asst. Atty. Gen., Charleston, for appellee.

McHUGH, Justice:

This action is before this Court upon the appeal of John Patrick McFarland, the appellant and defendant below, from convictions in the Circuit Court of Hardy County, West Virginia, for first degree murder without a ʳecommendation of mercy, first degree sexual assault and attempted first degree murder. Pursuant to such convictions the appellant was sentenced to life imprisonment without a possibility of parole, not less than ten nor more than twenty years, and not less than one nor more than five years, respectively. The circuit court further ordered that such sentences shall be served consecutively and not concurrently.

I

Because of the length and nature of certain assignments of error, some facts should be initially detailed in depth. In the early morning hours of April 26, 1982, neighbors of the appellant saw a woman running across the street toward their house. One of these neighbors testified that this woman, Maria, the appellant's stepdaughter, arrived at the neighbors' front door covered with blood and screaming hysterically. The woman was dressed in only a pair of socks. The neighbors laid

the woman on their couch and called the local sheriff's department and rescue squad.

Members of the rescue squad arrived at the scene at approximately 1:00 a.m. A number of the rescue squad members testified that upon their arrival they saw a car hastily leaving the appellant's residence. The appellant's stepdaughter was treated at the neighbors' house and transported to a local hospital where she had surgery to repair her wounds.

Local police officers arrived on the scene and searched the appellant's house. They discovered the appellant's son, John Wayne McFarland, dead on the living room floor. A further search of the house uncovered large amounts of blood, particularly in a back bedroom of the house. The appellant was not found in the area.

In addition to the presence of various bruises, cuts, scrapes, and abrasions, the autopsy of the appellant's son revealed the cause of death to be four stab wounds, including a wound through the right ventricle of the heart which further severed the pulmonary artery and vein. A knife was found remaining in one of the stab wounds.

At approximately 6:45 a.m. on the morning of April 26, 1982, the police and rescue squad of Staunton, Virginia received a call that a blood-covered man had pulled into a service station in that city. The appellant, who was initially nonresponsive to questions from authorities, was taken to a local hospital for treatment. Examination at the service station revealed that the appellant had two lacerations on each wrist and two lacerations in his abdominal area.

The appellant was placed under arrest while receiving treatment at the hospital when local police authorities learned of a fugitive warrant issued against him in the State of West Virginia. The appellant waived extradition proceedings and was returned to this State on April 27, 1982, the day after the crimes occurred. The Hardy County Grand Jury indicted the appellant for first degree murder, first degree sexual assault and attempted first degree murder.

At trial, the State's chief witness was Maria, the appellant's 16 year-old stepdaughter. She testified that on the morning of Sunday, April 25, 1982, the appellant, the stepdaughter Maria, and the appellant's son went to Virginia so that the appellant could talk to his wife. The appellant's wife had left the marital home one week prior to the visit and gone to Virginia to live with a relative. Maria testified that the appellant was upset as the three returned to their home in Wardensville, Hardy County, West Virginia, later in the day. The record indicates that the appellant's wife refused to reconcile their marriage and that she wanted custody of the two children. Maria testified that the appellant cried and drove recklessly during the trip home.

The appellant remained upset after they arrived in Wardensville. He discussed his domestic problems with his mother and father who had visited later that day. As the day wore on, the appellant made various telephone calls to relatives including his wife. Maria's boyfriend arrived for a visit that evening. At approximately 10:15 p.m. her boyfriend left, she went to bed and thereafter the attack on her began.[1]

1. Maria described the ensuing violence as follows:

A. After I went to bed, I—next thing I knew, I was in bed asleep—next thing I knew, I felt something cold in my back. Dad had gotten in bed beside me. I got up. I turned on the light. I said what are you doing? As I turned on the light, I saw him put something underneath the bed. It was a white towel. I didn't know what he was doing. I said what are you doing, and he said nothing. He said come here, baby, I want to talk to you. He said there's nothing wrong. So I went over, and when I got in arm's length reach, he pulled me over on the bed, and then he put his arms around my neck, and he strangled or choked until I blacked out. I think I blacked out, and then somehow I got awake, and I ran around to the other side of the bed, and under the bed was a knife and this towel with things in it. So I grabbed the knife and put it between my legs so that he couldn't get it, and then he hit me back.

Q. Where did he hit you, Maria?

A. Right here.

Q. You say you put the knife between your legs. Were you standing or kneeling?

A. I was kneeling. He slapped me back until I fell on the floor, and then he had me down on the floor, and he had the knife in his hand, and

The appellant asserted the defense of insanity. Through various experts he attempted to establish that a delirium due to diabetic and other conditions caused his violent behavior. The evidence indicates that the appellant had not taken a second insulin shot during the evening. In addition, there was evidence that he had ingested alcohol and a number of his prescription drugs that day for other diabetes-

I said, Dad, if you love me—and before I finished—

Q. You said Dad, what?

A. I said Dad, if you love me, and before I finished, he stabbed me in the stomach. Then he stabbed me in the chest and left the knife in.

Q. He left the knife sticking in your chest?

A. Yes. And my brother came back in the doorway and asked what was the matter, and Dad got up and said nothing's the matter. Go back to sleep. And he went out with Johnny. Then he came back, and he had a flashlight with him, and he flashed the flashlight over me, I guess to see if I was still living or not. Then he took the knife out, put me up on the bed—

Q. Took the knife out of your chest?

A. Yes. Put me up on the bed—I'm sorry—I don't remember.

Q. You don't remember what happened then? Take your time, Maria.

(Pause)

A. He left again. And Johnny came back in the doorway, and he saw me, but I don't know if he saw me—you know, saw the way I was or not, if he saw anything wrong, and then he left, and then Dad came back in, and he cut my underwear off. Then he took what looked like was an apple on top of a knife, which it wasn't but that's what it looked like, and he tried to rape me with that, but he couldn't. So then he did himself.

Q. He raped you himself?

A. Yes.

Q. Did he make penetration in you?

MR. ASKIN: I object to leading questions.

BY THE COURT: It's leading, but we would understand. I believe she understands the question. Ask the question again.

Q. Did your dad, when he raped you, did he make penetration?

A. Yes.

MR. ASKIN: Same objection, Your Honor.

Q. Then what happened?

A. Um—then he left again, and he went into the living room, and I heard two long screams, which was my brother.

Q. Johnny?

A. Yes. He had killed my brother.

Q. How do you know he killed your brother?

A. I just know. I knew by the screams.

Q. What about the screams made you feel that?

A. They were two long screams, and then they cut off—just cut—

Q. Did you hear anything else from your brother after that?

A. No, I didn't.

Q. And what happened next?

A. Then he came back and closed the door and locked it, and got the flashlight and flashed it over me again, and put it in a certain place. Then he got the knife—but I don't remember if he stabbed me again or did my wrists first.

Q. That's alright. Just tell what he did. What did he do with the knife? Regardless of whether it was first or second, what did he do with the knife?

A. He cleaned it after he had stabbed me again.

Q. Where did he stab you?

A. Right here.

Q. Is that the second time he stabbed you in the chest?

A. Yes.

Q. Then did he stab you any place else with the knife?

A. My neck.

Q. Where in the neck did he stab you?

A. Right here.

Q. Did he stab you or cut you any place else with the knife?

A. He cut both my wrists with a knife.

Q. What did he do with the razor?

A. He sliced my wrists more and then my neck.

Q. And what happened then after this stabbing and cutting occurred with the razor?

A. Excuse me?

Q. I say what happened after this occurred, after the stabbing with the knife and the cutting with the razor blade?

A. He cut my wrists before he used the razor blade. He stabbed me in the neck twice, and then well—he cut my wrists before he stabbed me in the neck, and then he put the knife in a certain place and flashlight in a certain place and the razor blade in a certain place in a night stand beside where he was laying. And then he took the razor blade and sliced my wrists and my neck.

Q. What did he do after that?

A. He laid down. He had cut his wrists while he was cutting mine.

Q. He cut his own wrists while he was cutting yours?

A. Yes. And he attempted to stab himself in the stomach.

Q. And during this whole time, did you attempt to leave or scream or anything like that?

A. No, I didn't. I couldn't scream because I had been choked, and I thought if I didn't say anything, he would stop.

Q. Alright, then what happened then?

A. Then he laid down and then raised up and flashed the flashlight over me again and sat up and was going to cut me between the legs, but I got up, and I ran. I unlocked the bedroom door, and I ran, and I saw Johnny laying on the floor. Then I ran to the back door, and I unlocked those, and then I ran to the Aylor's.

related ailments. In rebuttal, the State presented expert testimony to the effect that the appellant's physical and mental condition preceding the incident would not cause such a violent outburst.

## II

The appellant assigns a number of errors related to his right to a fair and impartial trial.[2]

### A

The appellant first contends that the circuit court erred when it denied his motion for a change of venue. The appellant cites two primary reasons in support of this motion. The first is the result of a survey conducted in Hardy County by the appellant and, second, the alleged difficulty of the court and the parties to choose an unbiased jury during *voir dire.*

The right of a defendant in a criminal trial to seek a change of venue emanates from article III, section 14 of the *Constitution of West Virginia* which provides, in pertinent part, as follows: "Trials

of crimes, and misdemeanors, unless herein otherwise provided, shall be ... in the county where the alleged offence was committed, unless upon petition of the accused, and for good cause shown, it is removed to some other county." *W. Va. Code,* 62–3–13 [1931], in part, further provides: "A court may, on the petition of the accused and for good cause shown, order the venue of the trial of a criminal case in such court to be removed to some other county."

We held in syllabus point 1 of *State v. Zaccagnini,* 172 W.Va. 491, 308 S.E.2d 131 (1983), as follows:

" 'To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests on the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed,

**2.** The appellant assigns other errors on the part of the circuit court that are without merit for reasons stated below.

The appellant assigns a number of errors that are evidentiary in nature: the circuit court erred when it disallowed Maria's testimony regarding the taking of birth control pills; the circuit court erred when it allowed the State to cross-examine one of the appellant's expert witnesses beyond the scope of direct examination; the circuit court erred when it allowed the State to propound through a series of questions a hypothetical question to one of its expert witnesses; the circuit court erred when it allowed a State expert witness to testify concerning the behavior of a diabetic with a blood sugar of 500; the circuit court erred when it allowed a Staunton, Virginia police officer to testify concerning his impressions of the appellant's mental awareness; the circuit court erred when it allowed the State to use the word "impaired" when examining an expert; and the circuit court erred when it permitted Maria to testify that during the trip back to West Virginia before the assault tne appellant stated he could kill his wife. We hold that the circuit court did not abuse the discretion afforded it generally in rulings on the admissibility of evidence in the above assignments of error. *See* syl. pt. 2, *State v. Peyatt,* 173 W.Va. 317, 315 S.E.2d 574 (1983); *State v. Louk,* 171 W.Va. 639, 301 S.E.2d 596, 599 (1983).

The appellant asserts that the circuit court erred when it admitted into evidence nine exhibits that the appellant alleges are gruesome and without probative value. The appellant describes the nine questioned exhibits as a bloody pair of blue denim shorts and bloody bed clothing found in various parts of the house. We find no error. Merely being "bloody" does not make the exhibits "gruesome." *See State v. Rowe,* 163 W.Va. 593, 595, 259 S.E.2d 26, 28 (1979).

The appellant also assigns as error the giving of certain instructions to the jury. The appellant challenges the last sentence of State's Instruction Number 2 that deals with when a defendant may be convicted of first degree sexual assault upon the uncorroborated testimony of the victim and State's Instruction Number 6 on the issue of intoxication. We find no error in the reading of these instructions to the jury. *See* syl. pt. 8, *State v. Hall,* 171 W.Va. 212, 298 S.E.2d 246 (1982).

Finally, the appellant asserts that the circuit court erred when it denied his motions for judgments of acquittal under *W. Va.R.Crim.P.* 29 on all three counts of the indictment at the conclusion of the State's case and before submission of the case to the jury. We find no error by the circuit court in this regard. *See* syl. pt. 1, *State v. Horton,* 170 W.Va. 395, 294 S.E.2d 248 (1982); syl. pt. 5, *State v. Woods,* 169 W.Va. 767, 289 S.E.2d 500 (1982).

unless it clearly appears that the discretion aforesaid has been abused.' Point 2, syllabus, *State v. Wooldridge*, 129 W.Va. 448, 40 S.E.2d 899 (1946)." Syllabus point 1, *State v. Sette*, [161] W.Va. [384], 242 S.E.2d 464 (1978).

*See* syl. pt. 1, *State v. Ginanni*, 174 W.Va. 580, 328 S.E.2d 187 (1985); syl. pt. 2, *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983); *see also* syl. pt. 4, *State v. Hall*, 171 W.Va. 212, 298 S.E.2d 246 (1982); syl. pt. 2, *State v. Gangwer*, 169 W.Va. 177, 286 S.E.2d 389 (1982).

In syllabus point 1 of *Keys v. Hey*, 164 W.Va. 132, 260 S.E.2d 837 (1979), this Court further held:

> "'Good cause shown' for change of venue, as the phrase is used in W.Va. Constitution, Article III, Section 14 and W.Va.Code, 62–3–13, means proof that a defendant cannot get a fair trial in the county where the offense occurred because of the existence of a locally extensive present hostile sentiment against him." Syl. pt. 1, *State v. Pratt*, [161] W.Va. [530], 244 S.E.2d 227 (1978).

*See W.Va.R.Crim.P.* 21(a)[3]; *see also State v. Young*, 173 W.Va. 1, 311 S.E.2d 118 (1983); syl. pt. 1, *State v. Peacher*, 167 W.Va. 540, 280 S.E.2d 559 (1981); syl. pt. 6, *State v. Riley*, 151 W.Va. 364, 151 S.E.2d 308 (1967); syl. pt. 2, *State v. Loveless*, 142 W.Va. 809, 98 S.E.2d 773 (1957).

Similarly, although we have held that the county-wide existence of a "present hostile sentiment against an accused ... is good cause for removing the case to another county," syl. pt. 2, *State v. Zaccagnini, supra*, this Court also held in syllabus point 1 of *State v. Gangwer, supra*, that "[w]idespread publicity, of itself, does not require change of venue, and neither does proof that prejudice exists against an accused, unless it appears that the prejudice against the accused is so great that he cannot get a fair trial." *See* syl. pt. 2, *State v. Young, supra;* syl. pt. 2, *State v. Audia*, 171 W.Va. 568, 301 S.E.2d 199 (1983).

The survey in question was composed of the completed questionnaires of ten residents of two areas of Hardy County, Moorefield and Wardensville.[4] All of the persons surveyed, with the exception of one person who declined to complete the questionnaire, expressed the opinion that the appellant was guilty and that they had heard similar sentiments from other county residents. The majority of those surveyed, however, indicated that they thought the appellant could receive a fair trial in Hardy County.

In *State v. Zaccagnini, supra*, 172 W.Va. 494–495, 308 S.E.2d at 134–35, this Court was confronted with the use of affidavits to support a motion for a change of venue based upon alleged widespread publicity. This Court found the affidavits to contain "general language which was con-

---

**3.** *W.Va.R.Crim.P.* 21(a) provides:

> *For Prejudice in the County of Indictment.* The circuit court upon motion of the defendant shall order the proceedings transferred as to him to another county if the circuit court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at the place fixed by law for holding the trial.

**4.** The questionnaires read as follows:

1. Do you think John McFarland would get a fair trial in Moorefield?
2. Why do you think so?
3. What have you heard about the case?
4. Have you heard anyone talk about the case?
5. What did they say?
6. Have you heard anyone say he is probably guilty?
7. Have you any opinion of his being guilty or innocent?
8. Do you know why the trial has been delayed in this case?
9. Do you feel because of this delay, it would tend to make you believe he is guilty?
10. Do you think psychiatrists and psychologists provide real help to people in trouble?
11. Do you usually vote the strict political party line on most issues in most elections?
12. Do you believe that tourists and other out of staters directly cause a lot of trouble in West Virginia and tend to make fun of us?
13. Do you think that going out of state or the county for a lawyer should be discouraged: that you have good and capable lawyers here in Hardy County?
14. What is your views [sic] on the trouble between the judge and the out of town lawyer in this case?

clusionary in nature." 172 W.Va. at 494, 308 S.E.2d at 134. We noted in *Zaccagnini* that "[s]uch affidavits ... often are relevant evidence on a change of venue issue. However, we have generally held that affidavits which only state the opinion of the affiant that local prejudice exists will not alone support the granting of a change of venue." 172 W.Va. at 495, 308 S.E.2d at 135; *see* syl. pt. 3, *State v. Riley, supra.*

■ Even though a majority of individuals surveyed in a county where a prosecution is pending, by way of a questionnaire, indicate that, based upon what they have heard or read, there is existing hostile sentiment in that county but that the defendant would receive a fair trial in that county, before a change of venue shall be granted the circuit court must be satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial. *W.Va.R.Crim.P.* 21(a).

Nor does there appear to have been inordinate evidence of prejudice and hostility toward the appellant elicited during *voir dire*. The record indicates that although six out of the twenty-five prospective jurors called were dismissed for cause only three were dismissed for prejudging the guilt of the appellant. In any event, all prospective jurors who expressed an opinion as to the appellant's guilt were excused from the panel. *See State v. Audia, supra,* 171 W.Va. at 573, 301 S.E.2d at 204.

■ On the record before us the trial judge properly found that the appellant did not meet his burden of demonstrating a county-wide "present hostile sentiment" such that he would be deprived of a fair trial. The circuit court, therefore, did not abuse its discretion when it denied the appellant's motions for a change of venue or for a change of the jury venire.

### B

The appellant also asserts that the circuit court erred when it failed to ask the prospective jurors during *voir dire* certain questions submitted to the court by the appellant. The appellant sought to have the court ask Questions 21 and 22 on the issue of insanity,[5] and Question 32 on the theories underlying incarceration.[6] The appellant argues that the circuit court's refusal to ask such questions infringed upon his ability to determine whether the jurors were free from prejudice and bias and to effectively exercise his peremptory challenges.

It is well established that "[i]n a criminal case, the inquiry made of a jury on its voir dire is within the sound discretion of the trial court and not subject to review, except when the discretion is clearly abused." Syl. pt. 2, *State v. Beacraft*, 126 W.Va. 895, 30 S.E.2d 541 (1944); *see also* syl. pt. 3, *State v. Angel*, 173 W.Va. 620, 319 S.E.2d 388 (1984); *State v. Ashcraft*, 172 W.Va. 640, 309 S.E.2d 600, 608 (1983); *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251,

**5.** Questions 21 and 22, as submitted to the court by the appellant, read as follows:

21. Have you read or heard about a criminal case where the insanity defense was raised successfully or unsuccessfully in the past six months?

22. If affirmative response, please ask individual juror what they read or heard about the case. If affirmative response, please ask the individual what they thought about the verdict.

**6.** Question 32, as submitted to the court by the appellant, read as follows:

32. If the court intends to have a unitary trial and not bifurcate the issues of guilt-innocence and punishment, then defendant requests the following:

There are generally regarded three major schools of thought on incarceration or sending someone to the Penitentiary. One is rehabilitation, sending someone to the Penitentiary in order to rehabilitate them so that they will be better when they get out. Two is punishment. They do wrong and, therefore, they should be punished for what they did. The third school is deterrence. Making examples of a law breaker so that other people see what happens when people break the law. Now, keeping in mind the three schools of thought on incarceration—punishment, rehabilitation, and deterrence—Ask each juror individually, what school of thought to believe is proper: (1) Do you feel a person should be sent to the Penitentiary to punish them for what they have done; to deter others by making an example of them; try to help them so that they won't do it again, that is, rehabilitate them?

263 (1983); *State v. Harshbarger*, 170 W.Va. 401, 294 S.E.2d 254, 257 (1982).

■ As we held in syllabus point 5 of *State v. Peacher*, 167 W.Va. 540, 280 S.E.2d 559 (1981), however:

It is an abuse of discretion and reversible error for a trial judge, in the exercise of his discretionary control over the scope of inquiry during *voir dire*, to so limit the questioning of potential jurors as to infringe upon a litigant's ability to determine whether the jurors are free from interest, bias or prejudice, or to effectively hinder the exercise of peremptory challenges.

*See also* syl. pt. 2, *State v. Toney*, 171 W.Va. 725, 301 S.E.2d 815 (1983).

In *Peacher*, we further noted that the purpose of *voir dire* is to assure that the defendant's right to a jury free of interest, bias or prejudice is protected and effectuated. (citation omitted) *Voir dire* works to protect that right not only by providing the basis for challenges for cause but also by providing a basis to "enable a litigant and his counsel to exercise reasonable judgment in utilizing peremptory challenges." (citation omitted) Where a trial court's restriction of the scope of *voir dire* undermines the right sought to be protected by the *voir dire* process it will be held to be an abuse of discretion and reversible error.

167 W.Va. at 552–553, 280 S.E.2d at 569–70.

Rather than ask the appellant's *voir dire* questions on the issue of insanity, the circuit court twice questioned the prospective jurors as a group concerning their knowledge of the verdict of the trial of John Hinckley, Jr. who had recently been found not guilty by reason of insanity for the attempted assassination of the President of the United States. The court asked all prospective jurors if such knowledge would interfere with their ability to render a fair and impartial verdict in the appellant's trial. There were no responses.

■ It is within the sound discretion of the trial court to reject the proposed *voir dire* questions of a criminal defendant when the questions are substantially covered by others which are used. *See State v. Simmons*, 172 W.Va. 590, 601, 309 S.E.2d 89, 100 (1983); *W.Va.R.Crim.P.* 24(a).

■ It is clear to this Court from a review of the record that the circuit court afforded the appellant wide latitude in the *voir dire* of the prospective jurors on all issues including the insanity defense. It is our opinion that the appellant was not hindered in his determination of whether the prospective jurors were free from interest, bias or prejudice nor was he effectively hindered in the exercise of his peremptory challenges. The circuit court did not abuse its discretion in this regard.[7]

■ With respect to the question concerning the theories underlying incarceration, *see supra* note 6, we held in syllabus point 7 of *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983), that "[a] defendant charged with murder of the first degree is entitled to question potential jurors on *voir dire* to determine whether any of them are unalterably opposed to making a recommendation of mercy in any circumstances in which a verdict of guilt is returned." This Court further noted:

The purpose of such questioning should be to discover whether any of the prospective jurors hold any personal, moral, religious or philosophical beliefs, convictions, scruples or opinions which would preclude them from considering the imposition of a *particular* penalty in the event of conviction regardless of the circumstances of the case. The inquiry must go to the willingness of the prospective jurors to exercise their discretion to determine the penalty. Counsel may not use the *voir dire* to suggest a verdict to the jury or to elicit a commitment from the jury to return a particular penalty in the event of conviction. [citations omitted] In addition, the questions should be specific enough to adequately

---

7. The circuit court did allow Questions 21 and 22 to be asked individually to the prospective

alternate jurors.

inform the jury of the substance of counsel's inquiry.

172 W.Va. at 307–308, 305 S.E.2d at 264 (emphasis added).

■■■■■ We do not believe that the appellant's *voir dire* question on incarceration theories met these requirements. The appellant's question simply inquired into the prospective jurors' views on the various theories underlying incarceration: punishment, rehabilitation and deterrence. *See supra* note 6. The appellant did not inquire into the unwillingness of any of the prospective jurors to impose a particular penalty, that is, make a recommendation of mercy in the event of the verdict of guilt. The circuit court did not abuse its discretion in excluding the question from *voir dire* of the prospective jurors.

### III

The appellant's next assignment of error is that the circuit court erred when it denied his motion for severance of the three counts of the indictment. The appellant primarily argues that he was prejudiced by the inclusion of the sexual assault count in the trial because (1) the sexual assault evidence was sparse and in a separate trial he could have been acquitted, (2) he was unable to vigorously cross-examine the victim for fear of arousing the sympathy of the jury for the witness, and (3) as a result of his inability to cross-examine the victim he was effectively denied the right to testify on his own behalf.

There is no assertion on the part of the appellant that these offenses were improperly joined in the indictment under *W.Va. R.Crim.P.* 8(a).[8] The appellant sought a separate trial on the first degree sexual assault count under *W.Va.R.Crim.P.* 14(a), which provides, in pertinent part, as follows:

If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or information or

by such joinder for trial together, the court may order an election or separate trials of the counts or provide whatever other relief justice requires.

*See State v. Cunningham,* 170 W.Va. 119, 290 S.E.2d 256, 259 (1981); *State v. Mitter,* 168 W.Va. 531, 285 S.E.2d 376 (1981).

We stated in *State v. Mitter, supra* at 383, that in "situations where there has been either a joinder of separate offenses in the same indictment or the consolidation of separate indictments for the purpose of holding a single trial, the question of whether to grant a motion for severance rests in the sound discretion of the trial court."

In *Mitter,* this Court discussed the several circumstances upon which a motion for severance of charges into separate trials depends. We stated that "where there are separate offenses arising out of the same transaction, there may be some instances when a defendant's motion for severance should be granted." 168 W.Va. at 543, 285 S.E.2d at 383. We further stated:

Courts that have addressed the problem have recognized that joinder or consolidation may prejudice the defendant because the jury may tend to cumulate the evidence of the various offenses and convict the defendant on all offenses charged on the theory he is a bad individual rather than weigh the evidence separately on each offense. From the defense standpoint, trial on multiple offenses may make it difficult to establish separate defenses to individual charges. Furthermore, it may inhibit the defendant's ability to testify on his own behalf if he wishes to testify about some of the charges but not about others.

168 W.Va. at 543, 285 S.E.2d at 383.

This Court found in *Mitter* that the circuit court had not abused its discretion when it denied the defendant's motion for severance of the charges. The defendant had been separately indicted for five offenses of sexual abuse which were later

---

8. *W.Va.R.Crim.P.* 8(a) provides, in pertinent part:

All felonies based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a

common scheme or plan shall be charged in the same indictment or information in a separate count for each offense, whether felonies or misdemeanors or both.

consolidated into one indictment. We determined in *Mitter* that the circuit court did not err for the following reasons:

> Defendant's defense was essentially the same to all charges: that he did not commit the offenses. This case was not one where the defendant could argue that the State's proof was so minimal on a given charge that to permit it to be tried with other charges would result in bolstering the weak charge. Finally, there was no contention made that the defendant desired to testify on some of the charges and not others.

168 W.Va. at 544, 285 S.E.2d at 383.

In *State v. Cunningham, supra,* we applied similar principles to convictions for armed robbery and first degree sexual assault in a single trial. In that case, the defendant had followed a store clerk into a store cooler and forced her to perform oral sex. The defendant then left the clerk in the cooler and emptied the cash register as he left. We stated:

> Applying the law as stated above to the facts in this case we cannot say that the trial court abused its discretion in denying the appellant's motion. The facts of the sexual assault were certainly necessary to prove the elements of the armed robbery. In turn the record demonstrates that evidence of the armed robbery would have punctuated the State's case concerning the events surrounding the sexual assault. A difficulty in sustaining the presumption of innocence because an accused has committed two serious crimes at the same time is not the same as prejudice. There was absolutely no prejudice to the accused since both crimes were proven beyond a reasonable doubt and the accused would not have been able to offer a better defense if the counts had been severed.

170 W.Va. at 122, 290 S.E.2d at 259–60.

 The reasonings employed in *Mitter* and *Cunningham* are applicable to the case now before us. The appellant's defense to all of the charges that arose out of the violence in his home that evening was insanity. Inasmuch as the evidence is clear that Maria was sexually assaulted after she had been stabbed a number of times we cannot conceive of a better defense that the appellant could have asserted to the sexual assault charge in a separate trial. We are of the opinion that there was sufficient evidence to support the first degree sexual assault charge[9] and, further, that such evidence was not so weak or minimal so as to risk having the sexual assault charge "bolstered" by the evidence of the other charges. We find no merit in the appellant's assertion that he was prevented from cross-examining the witness as vigorously as he desired. The risk of arousing jury sympathy for a witness under cross-examination is one that attends every trial. Under the circumstances of this case, we do not believe that any prejudice to the appellant would justify a severance of the three counts in the indictment. The circuit court, therefore, did not abuse its discretion when it denied the appellant's motion to sever.

## IV

The appellant next asserts that the circuit court erred when it allowed two of the State's witnesses to testify concerning statements made by the appellant while he

---

9. In a related contention in which we find no error, the appellant asserts that the circuit court erred when it denied his motions for judgments of acquittal under *W.Va.R.Crim.P.* 29 at the completion of the State's case and before submission of the case to the jury on the first degree sexual assault charge. The appellant argues that there was insufficient evidence of penetration of the appellant's penis with the victim's sexual organ. In support the appellant points to the testimony of Dr. Gerald J. Bechamps, Maria's physician who oversaw pelvic and protocol examinations of Maria for purposes of discovering evidence of sexual assault.

Dr. Bechamps testified that the condition of the victim's genital area did not indicate sexual intercourse had occurred; however, he could not preclude its occurrence.

As quoted above, Maria testified that the appellant did make penetration during the attack. In view of the evidence at trial the circuit court clearly did not err when it denied the appellant's motions for judgments of acquittal. *See supra* note 2, *see also* syl. pt. 1, *State v. Horton*, 170 W.Va. 395, 294 S.E.2d 248 (1982); syl. pt. 5, *State v. Woods*, 169 W.Va. 767, 289 S.E.2d 500 (1982).

was in custody in the Virginia hospital. The appellant primarily argues that such statements are inadmissible because the circuit court failed to conduct *in camera* hearings on the voluntariness of such statements.

The first of the appellant's statements in issue was introduced into evidence during the State's case-in-chief by Robert L. Ferrell, Deputy Sheriff of Hardy County. Deputy Ferrell testified that he travelled to Staunton, Virginia the day of the incident upon learning that the appellant had been apprehended. The witness testified that upon his arrival he saw the appellant lying on a bed in a hospital room with his eyes closed. Deputy Ferrell stated that as he walked into the hospital room he said "Hello, Pat," and without opening his eyes the appellant responded by saying "Hello, Bob." Deputy Ferrell then gave the appellant his *Miranda* warnings. The State expressly stated at trial that this statement, which clearly is not inculpatory, was elicited from Deputy Ferrell to partially rebut evidence of insanity.

We find that the circuit court did not err when it refused to hold an *in camera* hearing on the voluntariness of the above described statement. Noninculpatory statements spontaneously made by a defendant in response to greetings or salutations of law enforcement officers do not result from "interrogations" under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny. *See Commonwealth v. Brantner*, 486 Pa. 518, 406 A.2d 1011 (1979); *see also People v. Ashford*, 265 Cal.App.2d 673, 71 Cal.Rptr. 619 (1968); *Johnson v. State*, 269 Ind. 370, 380 N.E.2d 1236 (1978); *State v. Ulm*, 326 N.W.2d 159 (Minn.1982). *Cf.* syl. pt. 1, *State v. Johnson*, 159 W.Va. 682, 226 S.E.2d 442 (1976) (a spontaneous statement made prior to any custodial interrogation is admissible without the voluntariness thereof being determined during an *in camera* hearing), *overruled in part on other grounds, State ex rel. White v. Mohn*, 168 W.Va. 211, 283 S.E.2d 914 (1981). *See also* syl. pt. 2, *State v. Rowe*, 163 W.Va. 593, 259 S.E.2d 26 (1979) (volunteered admissions, although without *Miranda* warnings, not inadmissible, unless defendant was both in custody and being interrogated) (in custody but not interrogated at time of admission). Under the circumstances described above, we believe that the appellant's statement was spontaneous and admissible without an *in camera* hearing on its voluntariness.

The second statement of the appellant in issue was introduced into evidence by the State during rebuttal through Mary Tyree who was the head nurse on duty in the emergency room at the time the appellant arrived at the Virginia hospital. Tyree testified that the appellant was alert and responsive to her questions of him in the emergency room. She stated that the appellant told her, *inter alia*, about his diabetes, prescriptions and other medical history. Tyree further testified that at a later time the appellant began to cry and said: "I'm sorry, I'm sorry" and "you all don't have to do this for me. I'm sorry. I'm sorry. I'm no good. Don't do this for me."

In *State v. Sanders*, 161 W.Va. 399, 242 S.E.2d 554 (1978), *overruled in part on other grounds, State ex rel. White v. Mohn*, 168 W.Va. 211, 283 S.E.2d 914 (1981), this Court included in a defendant's right to a voluntariness hearing statements made by the defendant to third parties other than police officers. We noted:

> One can involuntarily make an admission or a confession to any listener. Since the focal point of the inquiry is whether the statement is voluntary, the courts require an *in camera* hearing in such cases. (citations omitted) While the identity of the listener is an important factor to consider, it should not be determinative of the right to an *in camera* judicial determination of voluntariness in this case.

161 W.Va. 403–04, 242 S.E.2d at 556–57. In syllabus point 2 of *State v. Sanders, supra*, we held as follows:

> In a trial for murder where the defendant raises insanity as the sole defense, the court upon request should conduct an *in camera* hearing to determine whether incriminating statements made by the de-

fendant to a third party while in a hospital emergency room shortly after committing the homicide, attempting suicide, and having been diagnosed by the attending staff psychiatrist as "suicidally depressed and mentally ill," were voluntary and admissible into evidence.

The record in the case now before us is clear that the appellant had not been diagnosed as "suicidally depressed and mentally ill" by a psychiatrist in the emergency room prior to making the above described statements to the nurse. We also note that the statements herein are not inculpatory, unlike in *Sanders*, where the defendant stated to a friend, "no one would forgive a murderer," and "he [the victim] treated me like a dog at times." Under the circumstances of this case, we are of the opinion that the circuit court did not err when it admitted the statements into evidence without an *in camera* hearing on the voluntariness of such statements.

### V

The appellant finally assigns a number of errors concerning the expert testimony at trial on the issue of the appellant's insanity.

### A

The first assignment of error relating to the expert testimony concerns the testimony of Dr. Patricia Williams, a psychiatrist who testified during the State's rebuttal case. In answer to questions from the State, Dr. Williams testified that the appellant was "able to form an intent," "able to hold malice in his heart," and that "there was evidence he had premeditated." The appellant argues that the circuit court erred because it allowed Dr. Williams to testify concerning the ultimate issues in the case and, thereby, invaded the province of the jury. The appellant urges that the court violated the holdings in *State v. Mitter*, 168 W.Va. 531, 285 S.E.2d 376 (1981).

**10.** *See W.Va.R.Evid.* 704(b), effective February 1, 1985. We do not in this opinion address the

In *Mitter*, this Court found it to be reversible error when a circuit court permitted an expert witness to testify that the defendant's acts of sexual abuse toward his five stepdaughters was done for the purpose of gratifying his sexual desire. We held in syllabus point 3 of *Mitter* that "[t]he general rule is that expert opinion cannot be offered as to the subjective intent of an individual." We further noted in *Mitter*, however, as follows:

[W]e stress that we are not dealing here with the insanity issue where expert psychiatric testimony is clearly appropriate. What is involved in the case is the introduction into evidence of the conclusion of an expert on the subjective mental condition of the defendant, i.e. his sexual gratification, which is a key element of the crime of sexual abuse.

168 W.Va. at 538, 285 S.E.2d at 380.

As this Court held in syllabus point 1 of *Mitter:*

"Opinion evidence of competent experts may be properly called for when the questions presented are of such a nature that persons generally would not be as competent to pass judgment thereon as such experts." Syllabus Point 5, *Norfolk & Western Railway Co. v. Christian*, 83 W.Va. 701, 99 S.E. 13 (1919).

Upon a review of the record herein we decline in this case to delineate the contours of permissible psychiatric testimony in a criminal case involving the insanity defense, a question also left open in *Mitter*. The subject is very complex and it would be inappropriate for this Court to anticipate and to resolve the many related questions likely involved, without a precise presentation of the alleged error on the record and briefing of the issues. The matter does not involve merely the oversimplified principle of an expert's opinion on the ultimate issue invading the province of the jury.[10]

The manner in which the record was made in this case does not indicate the exact nature of the alleged error. After

effect of this rule to the facts of this case.

each of the three questions to the State's psychiatric expert witness on ability or capacity to form the specific intent (to kill, to hold malice, to premeditate), in rebuttal to the insanity defense testimony, the appellant's counsel made a general objection and subsequently a general motion to strike all three answers. The trial court overruled each of the general objections and denied the general motion to strike. These general protests to the admission of this evidence are in striking contrast to the specific tenor of virtually every other protest during the trial made by counsel for the appellant, who is obviously very able and skilled. Especially in the context of the complex issue of admissibility of psychiatric testimony in a criminal case, the repeated general objections and general motion to strike raise the question of whether the alleged error has been preserved on the record for purposes of appellate review by this Court.

> *A general objection overruled* [italics in original] is of small value to the objector on appeal.... The rationale of this rule is that the proponent of the evidence should be given an opportunity to meet the objection by reframing the question, laying the necessary foundation, or by other means. A general objection does not offer him this opportunity. Thus, the objector in most instances will lose his rights on appeal by failing to take further action after his general objection has been overruled.

F. Cleckley, *Handbook On Evidence for West Virginia Lawyers* § 18.B.3.c.(2) at 91 (1978). We have spoken in much the same way on this point: "This Court will not

consider an error which is not preserved in the record nor apparent on the face of the record." Syl. p. 6, *State v. Byers*, 159 W.Va. 596, 224 S.E.2d 726 (1976).[11]

While the general nature of the alleged error is apparent on the face of the record, namely, the superficial principle that an opinion of a witness, lay or expert, may not usurp the jury's function of finding the facts, the appellant's failure to make timely, specific objections and a specific motion to strike resulted in the State and the trial court not having the opportunity to avoid or to correct the alleged error by, for example, rephrasing the question. In addition, the precise nature of the alleged error is not apparent on the face of the record. For example, in his brief submitted to this Court the appellant notes that the admission of the evidence in question was allegedly improper for two reasons, specifically, "[t]he State failed to elicit from the doctor whether she understood the legal meaning of the words malice and premeditation and the doctor was being asked to draw a conclusion on the ultimate facts in issue before the jury." If the appellant had specified in his objection at trial the first of these reasons, the State would have been given the opportunity to lay the foundation more fully to meet the specific objection. If the appellant had specified the second of these reasons, the State could have rephrased the question in proper hypothetical formulation—according to the appellant in his brief.[12]

 In any event, for this Court to reverse the verdict in this case on account

---

**11.** *See W.Va.R.Evid.* 103(a)(1), effective February 1, 1985, and, therefore, not applicable to this case.

**12.** There are many other questions raised by the admission of this evidence, none of which were brought to the attention of the trial court or briefed by the parties on this appeal. Without attempting to make an exhaustive list and without ruling in this case on each question, a proper analysis of the admissibility of psychiatric testimony in a criminal case involving the insanity defense would discuss these questions:

(1) should there be a distinction made between psychiatric testimony on the capacity or ability to form the requisite specific criminal

intent and such testimony to the effect that the defendant did have that intent?

(2) does an insanity defense, as opposed to a "diminished capacity" defense, put into issue the defendant's capacity to form the requisite specific intent (as well as general criminal intent)?

(3) must the psychiatric testimony refer only to a hypothetical person as opposed to the defendant?

(4) may the State on rebuttal to an insanity defense, as opposed to the defendant while presenting his evidence, raise the question of capacity to form specific intent?

(5) should the "ultimate issue" bar be lifted in criminal cases as it has been in civil cases?

of such an isolated segment of testimony, in the whole mass, would be unwarranted.

Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.

Syl. pt. 2, *State v. Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980). *See State v. Cabalceta*, 174 W.Va. 240, 246, 324 S.E.2d 383, 389 (1984); syl. pt. 11, *State v. Gum*, 172 W.Va. 534, 309 S.E.2d 32 (1983). Assuming, without deciding, that the evidence in question was erroneously admitted, and assuming only for the instant that the error is apparent on the face of the record, the error, under the *Atkins* test, constitutes harmless nonconstitutional error in light of the overwhelming evidence remaining in support of the verdict and the obvious lack of prejudicial effect on the jury.

**B**

The appellant next asserts that the circuit court erred when it would not allow the appellant to examine the personal notes of Dr. Erma Ullrich, an endocrinologist who testified during the State's rebuttal case. The circuit court initially denied the appellant access to the notes because Dr. Ullrich did not refer to them during her testimony. The appellant established during cross-examination, however, that the witness had used the notes prior to being called as a witness to refresh her memory and prepare her testimony. Dr. Ullrich testified that the notes in question were

her abstracts of other reports already in the possession of the appellant. The circuit court again denied the appellant's motion to examine the notes.

*W.Va.R.Crim.P.* 26.2(a) provides as follows:

After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and his attorney, as the case may be, to produce for the examination and use of the moving party any statement of the witness that is in their possession that relates to the subject matter concerning which the witness had testified.

*See State v. Watson*, 173 W.Va. 553, 318 S.E.2d 603, 608–10 (1984); [13] *see also* syl. pt. 2, *State v. Helmick*, 169 W.Va. 94, 286 S.E.2d 245 (1982); syl. pt. 3, *State v. Sette*, 161 W.Va. 384, 242 S.E.2d 464 (1978). Rule 26.2(f)(1) defines "statement," *inter alia*, as "[a] written statement made by the witness that is signed or otherwise adopted or approved by him."

It is important to note that the appellant in this case does not deny that he had in his possession the statements and reports upon which Dr. Ullrich's notes were based. It is also clear that her notes do not constitute a "statement" as defined in Rule 26.2(f).

The appellant was, therefore, not entitled to examine Dr. Ullrich's notes on cross-examination. The circuit court did not err when it denied the appellant's motion.

Based upon all of the above, the judgment of the Circuit Court of Hardy County is hereby affirmed.

Affirmed.

