# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## January 2019 Term

_____

No. 17-0713

_____

**FILED**

**May 17, 2019**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA,**
**Respondent**

**v.**

**J.C.**
**Juvenile below, Petitioner**

_____

**Appeal from the Circuit Court of Berkeley County**
**The Honorable Laura Faircloth, Judge**
**Case No. 17-JD-30**

**APPEAL DISMISSED AS MOOT,**
**REMANDED TO CIRCUIT COURT FOR FURTHER PROCEEDINGS**
_____

**Submitted: January 16, 2019**
**Filed: May 17, 2019**

Matthew Brummond, Esq.                Patrick Morrisey, Esq.
Public Defender Services              Attorney General
Charleston, West Virginia             Lindsay S. See, Esq.
Counsel for the Petitioner            Solicitor General
                                      Gordon L. Mowen, II., Esq.
                                      Assistant Attorney General
                                      Charleston, West Virginia
                                      Counsel for the State of West Virginia

**JUSTICE HUTCHISON delivered the Opinion of the Court.**

# SYLLABUS

"Moot questions or abstract propositions, the decision of which would avail nothing in the determination of controverted rights of persons or of property, are not properly cognizable by a court." Syl. Pt. 1, *State ex rel. Lilly v. Carter*, 63 W.Va. 684, 60 S.E. 873 (1908).

**HUTCHISON, Justice**:

In the instant case, the circuit court found a juvenile accused of delinquency not competent to proceed. "It is a fundamental guaranty of due process that a defendant cannot be tried or convicted for a crime while he or she is mentally incompetent." Syl. Pt. 5, in part, *State v. Hatfield*, 186 W.Va. 507, 413 S.E.2d 162 (1991). The Legislature has adopted various statutes to allow adult criminal defendants to be evaluated and treated for competency.[1] The Legislature has rightly and vigorously protected this fundamental right for adult criminal defendants. The same cannot be said for a juvenile who faces an accusation of delinquency. The Legislature has not created any statutory procedure to protect a juvenile's due process right to competency. As we discuss below, we call upon the Legislature to create a process to address the unique competency and mental health needs of juveniles facing delinquency proceedings, to protect those children who do not understand the adversarial process being brought against them by the State.

In the vacuum created by the absence of legislation, the circuit court applied a competency statute designed to address adult defendants and not juveniles. Under that statute, the court placed the juvenile in a mental health facility for a period of thirty-five years, as though the juvenile was an adult. The juvenile appeals that ruling. However, evidence suggests that the juvenile has since been restored to competency. As we discuss below, this new evidence renders the juvenile's appellate arguments moot.

---

[1] *See generally* W.Va. Code §§ 27-6A-1 to -11.

1

## I. Factual and Procedural Background

In February 2017, petitioner J.C. was seventeen years old. The State alleged in a juvenile petition that on February 6, 2017, J.C. "did unlawfully, feloniously and forcibly engage in sexual contact" with a ten-year-old child. That same day, law enforcement officers detained J.C. and, at least twice, advised him of his right to remain silent. J.C. nevertheless admitted to some form of sexual activity with the ten-year old, so the officers formally took him into custody.

A lawyer was appointed to represent J.C. at his February 6th emergency detention hearing. Before the hearing, J.C.'s lawyer spoke with the arresting law enforcement officer, and the officer expressed concerns about J.C.'s mental capacity. The lawyer also spoke with J.C.'s parents who told the lawyer that J.C. "was extremely slow and may not understand the nature of the charges" against him. The lawyer then met with J.C. and likewise became concerned about J.C.'s mental acuity.

The circuit court ordered J.C. detained at a juvenile center. Shortly thereafter, both a case manager and an education specialist at the juvenile center expressed concerns that J.C. did not understand the legal proceeding brought against him. They noted that J.C.'s most recent evaluations showed a low verbal comprehension score and low perceptual reasoning score, as well as a full scale IQ of 70. Seventeen-year-old J.C.'s achievement scores were at a third-grade level.

Based upon these concerns, J.C.'s lawyer filed a motion for an evaluation of J.C.'s competency. The State joined in the motion for a competency evaluation, noting, "[t]he State has been made aware of the same concerns involving the Juvenile." The circuit court ordered an examination to determine if J.C. was competent to stand trial.

A licensed psychologist evaluated J.C. and opined that J.C. "is <u>not Competent</u> to Stand Trial." The psychologist concluded in her report, "[t]he conditions underlying his lack of competency will not change in the foreseeable future, and thus, he <u>will not regain competency</u>."[2]

In an order dated July 13, 2017, the circuit court accepted the competency evaluation and found that J.C. "is incompetent to stand trial and not likely to regain competence." Moreover, the circuit court accepted two stipulations by J.C.'s lawyer: that J.C. could have been convicted of first degree sexual assault (s*ee* W.Va. Code § 61-8B-3 (2006)), and that the charge against J.C. "involved an act of violence against a person[.]"

---

[2] Because of his low cognitive abilities, the psychologist's evaluation showed that J.C. "tended to provide conflicting information" and "was highly susceptible to suggestion[.]" The psychologist found J.C. lacked the ability to provide information about his case or "to testify relevantly," because he "could not recall or relate facts, even with rephrasing and explaining" and because "he was highly susceptible to any suggestion and/or lead" and "generally was repeating/agreeable to the last option stated to him (regardless of the context)." The psychologist determined that J.C. failed to understand his lawyer's role, and also did not have the mental ability to work with his lawyer to develop a legal strategy.

3

Even though J.C. was a juvenile subject to the court's juvenile jurisdiction, the parties agreed that the circuit court's disposition of J.C. was controlled by a statute addressing the pretrial competency of an adult criminal defendant, West Virginia Code § 27-6A-3 (2007).[3] To simplify our discussion, we refer to this statute as "Section 3." Section 3 repeatedly uses the word *defendant*, and often in the context of a defendant who has been *indicted* or *charged* for a crime involving an act of violence against a person. Paragraph (h) of Section 3 provides that if a court finds a defendant is not competent to stand trial and not likely to attain competency, then the circuit court shall calculate the "maximum sentence" the defendant could have received if he or she had been *convicted*. *See* W.Va. Code § 27-6A-3(h). The circuit court must then order the defendant committed to a mental health facility. Paragraph (h) of Section 3 dictates that the defendant remains in the facility under the circuit court's jurisdiction until either (1) the "maximum sentence" expires, (2) the defendant attains competency to stand trial and the criminal charges are resolved, or (3) the court dismisses the criminal charges. *Id.*

Paragraph (h) of Section 3 does not mention juveniles, nor does the statute mention juvenile proceedings. In fact, juvenile proceedings do not involve charges, indictments, defendants, or sentences. Despite these problems, the parties agreed that the statute applied to J.C.'s juvenile proceeding.

---

[3] We discuss and quote this statute in greater detail in our discussion. *See infra*, footnote 6.

4

The sticking point for the parties was the phrase "maximum sentence" in paragraph (h) of Section 3. In other words, having agreed that J.C. was incompetent, the parties struggled regarding the period of time J.C. would remain in a mental health facility. J.C.'s lawyer argued that under statutes governing juvenile proceedings, the circuit court's jurisdiction over a delinquent juvenile ends when the juvenile reaches the age of twenty-one. *See* W.Va. Code § 49-4-701(f)(1) (2016). Because J.C. was a juvenile when the alleged offense occurred, his counsel argued that any "maximum sentence" J.C. could have received would have ended when he was twenty-one years old. Hence, counsel argued that J.C. could only be committed to a mental health facility until he reached the age of twenty-one.

The State, however, contended that Section 3, paragraph (h), requires a circuit court to retain jurisdiction over a defendant not competent to stand trial for a period equivalent to the "maximum sentence he or she could have received." The maximum sentence that can be imposed on an adult for first-degree sexual assault is thirty-five years. *See* W.Va. Code 61-8B-3(b) (2006). Further, the State argued that if the circuit court had merely delayed ruling on J.C.'s competency, then the court could have transferred J.C. to adult status. *See* W.Va. Code § 49-4-710 (2015) (requiring a circuit court to transfer a juvenile to adult criminal jurisdiction if there is probable cause to believe the juvenile

committed first-degree sexual assault).[4]  Once J.C. was transferred to adult status, the court could have found J.C. incompetent as an adult and its application of paragraph (h) to J.C. would have been proper.  The State therefore asked the circuit court to commit J.C. to a mental health facility under the court's jurisdiction for thirty-five years.

The circuit court adopted the State's position.  The circuit court found that the "maximum time the Juvenile could have received after conviction is 35 years."  It therefore ordered that J.C. "be committed to a mental health facility . . . for a maximum period of 35 years."

With new counsel, J.C. appealed the circuit court's July 13, 2017, commitment order to this Court.

While J.C.'s appeal was pending, the record indicates that J.C. was initially placed in an out-of-state facility for juvenile-oriented mental health treatment.  When J.C. turned eighteen, he was returned to West Virginia and placed in Sharpe Hospital.  Sharpe

---

[4] Transfer from juvenile to adult jurisdiction is a "critical phase" of a case that constitutionally requires competence and participation by the juvenile.

> Since waiver of juvenile jurisdiction is a critical stage in criminal proceedings against a juvenile, constitutional due process demands that the child, his parents and his counsel be afforded reasonable notice of the waiver hearing, the charge to be considered, a reasonable opportunity to prepare a defense to such waiver and a meaningful hearing at which evidence on behalf of the juvenile should be permitted.

Syl. Pt. 1, *State v. McArdle*, 156 W.Va. 409, 194 S.E.2d 174 (1973) (*modified on other grounds by State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982)).

Hospital evaluators diagnosed J.C. with "borderline intellectual functioning." However, according to his evaluators, J.C. "received education about the legal system" at Sharpe Hospital "for approximately three months." Sharpe Hospital evaluators decided that, because of that education, J.C. now "has an adequate factual and rational understanding of the proceedings against him" and has the "knowledge and ability to work with his attorney." Accordingly, on June 11, 2018, the acting director at Sharpe Hospital reported to the circuit court that J.C. "is now competent to stand trial."

The State thereafter filed a motion with this Court to dismiss J.C.'s appeal as moot, based upon the Sharpe Hospital report that J.C. has achieved competency. This Court denied the State's motion and allowed J.C.'s arguments challenging the circuit court's order committing him to a mental health facility for thirty-five years to proceed to oral argument.

## II. Discussion

J.C.'s appellate counsel argues that the circuit court never should have applied West Virginia Code § 27-6A-3(h) (again, "Section 3") to his case.[5] J.C.'s appellate counsel contends that Section 3 does not apply to children under a court's juvenile jurisdiction (even though J.C.'s prior lawyer agreed to the use of the statute by the circuit

---

[5] Because he was a juvenile, J.C. also argues that under West Virginia Code § 27-6A-3(h) the circuit court only had authority to hospitalize him until he reached the age of twenty-one – the same time that the circuit court's juvenile jurisdiction would have ended. We decline to reach this argument.

7

court below). J.C. points out that juvenile proceedings charge delinquency, not crimes, and courts treat juveniles as wards of the court. *See* W.Va. Code § 49-4-701 (2015). Juveniles are "adjudicated." When children face juvenile adjudication, they are never referred to as defendants and they are never convicted. By its terms, Section 3 applies when the State has charged a *defendant* with a crime, usually by indictment – something that cannot occur in a juvenile proceeding.[6] J.C. contends it was plain error for the circuit court to have applied paragraph (h) of Section 3 to his case.

---

[6] West Virginia Code § 27-6A-3(h) provides:

> If at any point in the proceedings the defendant is found not competent to stand trial and is found not substantially likely to attain competency, and if the defendant has been indicted or charged with a misdemeanor or felony in which the misdemeanor or felony does involve an act of violence against a person, then the court shall determine on the record the offense or offenses of which the person otherwise would have been convicted, and the maximum sentence he or she could have received. A defendant shall remain under the court's jurisdiction until the expiration of the maximum sentence unless the defendant attains competency to stand trial and the criminal charges reach resolution or the court dismisses the indictment or charge. The court shall order the defendant be committed to a mental health facility designated by the department that is the least restrictive environment to manage the defendant and that will allow for the protection of the public. Notice of the maximum sentence period with an end date shall be provided to the mental health facility. The court shall order a qualified forensic evaluator to conduct a dangerousness evaluation to include dangerousness risk factors to be completed within thirty days of admission to the mental health facility and a report rendered to the court within ten business days of the completion of the evaluation. The medical director of the mental health facility shall provide the court a

8

In response, the State asserts that the circuit court's application and interpretation of Section 3 was correct, and argues the court properly ordered J.C. be placed in a mental health facility for thirty-five years once he was found not competent to stand trial. In support, the State points to the one and only time this Court applied Section 3 to a juvenile.[7] Moreover, now that J.C. has been found competent, the State asserts this Court should return J.C. to the circuit court for further proceedings.

In seeking to resolve the parties' arguments, this Court has examined the statutes and rules regarding the pre-adjudication mental health of delinquent juveniles. What we have found is a substantial and troubling gap in the law regarding the handling and treatment of juveniles entangled in legal proceedings they are not competent to understand. The mental health statute relied upon by the parties and the circuit court, Section 3, is the statute that establishes what a court is to do if an adult criminal defendant

---

written clinical summary report of the defendant's condition at least annually during the time of the court's jurisdiction. The court's jurisdiction shall continue an additional ten days beyond any expiration to allow civil commitment proceedings to be instituted by the prosecutor pursuant to article five of this chapter. The defendant shall then be immediately released from the facility unless civilly committed.

[7] In *State ex rel. Smith v. Sims*, 235 W.Va. 124, 772 S.E.2d 309 (2015), this Court interpreted the application of West Virginia Code § 27-6A-3 to a twelve-year-old juvenile. We found, in Syllabus Point 4, that: "Possession of a deadly weapon on the premises of an educational facility with the express intent to intimidate another student 'involves an act of violence against a person[.]'" The question that was never raised in that case was whether the statute should even have been applied to a juvenile.

9

is found incompetent. However, Section 3 seemingly has no application to juvenile proceedings.

We have found only one mental health statute that clearly addresses juveniles: West Virginia Code § 27-6A-9 (2007) (Section 9). Section 9 allows a court to order a mental health "evaluation of a juvenile to aid the court in its disposition" of the juvenile in *any* proceeding under Chapter 49.[8] That chapter of the West Virginia Code pertains to the welfare of children, and encompasses topics such as child abuse or neglect, and the powers of the Department of Health and Human Services or the Division of Juvenile Services to provide care, support and protective services for children. Important to this case, Chapter 49 also establishes the juvenile jurisdiction of courts over offenses committed when a child is under the age of eighteen.

---

[8] West Virginia Code § 27-6A-9 (2007) provides:

> In a similar manner and in accordance with procedures set forth in subsection (a), section two of this article [W.Va. Code § 27-6A-2(a)] or subsection (a), section four of this article [W.Va. Code § 27-6A-4(a)], a juvenile court may order a qualified forensic evaluator to conduct an evaluation of a juvenile to aid the court in its disposition under chapter forty-nine of this code. In a similar manner and in accordance with procedures set forth in subsection (d), section two of this article [W.Va. Code § 27-6A-2(a)] or subsection (d), section four of this article [W.Va. Code § 27-6A-4(a)], a juvenile court may order a period of observation for an alleged delinquent or neglected juvenile at a mental health facility designated by the department to aid the court in its disposition. The period of observation may not exceed fifteen days.

Section 9 provides that a juvenile may be sent to a forensic evaluator, or to a mental health facility for evaluation for up to fifteen days. Section 9 also provides that the evaluation must be conducted using procedures contained in two statutes: West Virginia Code §§ 27-6A-2(a) (2007) (regarding defendants "incompetent to stand trial") and -4(a) (2007) (regarding a defendant's diminished capacity or lack of criminal responsibility). For simplicity, we refer to these statutes as Section 2 and Section 4, respectively. Both of these statutes authorize the circuit court to conduct a forensic evaluation of an adult criminal defendant. However, neither Section 2 nor Section 4 outlines what the court should do if an evaluation finds the defendant to be incompetent. Moreover, neither Section 2, Section 4, nor Section 9 establish what a court is to do when an evaluation reveals a juvenile is incompetent.

Likewise, by rule, this Court has created a process that follows Section 9 for courts to address mental health concerns near the outset of juvenile proceedings. Rule 24(c) of the West Virginia Rules of Juvenile Procedure (2010) allows a circuit court, "sua sponte or upon motion of counsel," to order the psychological examination of a juvenile prior to adjudication. Rule 26 of the Rules of Juvenile Procedure provides that when a circuit court has "reasonable cause to believe" that a juvenile is "incompetent to stand trial," the court must order an examination.[9] As with Section 9, both rules provide for

---

[9] Rule 26 orders the court to seek competency evaluations pursuant to West Virginia Code §§ 27-6A-2 and -4. Neither of these statutes applies to juveniles, and both use terminology applicable to "a defendant in which an indictment has been returned" or similar language.

11

competency evaluations of juveniles using the procedures outlined in Section 2 and Section 4. However, neither rule dictates what a court should do once a juvenile is found incompetent to proceed.

In the instant case, once the circuit court found J.C. was incompetent, the court committed J.C. to a mental health facility for thirty-five years in accordance with the procedures outlined in Section 3. Neither the one juvenile mental health statute (Section 9) nor the two Court rules (R.Juv.Pro. 24 and R.Juv.Pro. 26) discussed above permit the application of Section 3 to an incompetent juvenile. Counsel for J.C. therefore makes a persuasive argument that Section 3 has no application to juvenile delinquency proceedings.

The question that arises then is this: when a court is acting within its juvenile jurisdiction, what should the court do when the court finds a juvenile is not mentally competent to participate? Constitutional due process prohibits the court from subjecting the incompetent juvenile to legal proceedings, but no statute identifies what actions a court should take next to protect the juvenile and the public. Under any circumstances, placing a juvenile into a mental health treatment setting imposes long-lasting physical and emotional burdens on juveniles and their families. It is also a course of action that places great burdens upon the public fisc. Although ensuring a juvenile's due process rights in the courtroom is required by the state and federal constitutions, this Court is hesitant to create a mental health treatment process to protect juveniles through court rules. Such a course necessitates input from the Legislature. Moreover, while the Legislature has designed detailed procedures for adults facing criminal charges who are not competent to

12

stand trial (or who require a criminal responsibility or diminished capacity evaluation for

trial) no such statutory procedures exist for juveniles.[10] It is therefore incumbent upon the

Legislature to create such a process for juveniles, and we call upon that body to study and

_____

[10] In the context of competency and due process, the United States Supreme Court has emphasized that juveniles must be treated differently from adults. First, juveniles are inclined to be less mature and to lack a sense of responsibility, qualities that "often result in impetuous and ill-considered actions and decisions." *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (citations omitted). Second, juveniles are more susceptible to peer and other negative pressures. *Id.* Finally, the personality traits and character of juveniles are not as well formed as that of an adult. *Id.* at 570. "[B]asic research on cognitive and psychosocial development suggests that some youths will manifest deficits in legally-relevant abilities similar to deficits seen in adults with mental disabilities, but for reasons of immaturity rather than mental disorder." Thomas Grisso, et al., "Juveniles' Competence to Stand Trial: A Comparison of Adolescents' and Adults' Capacities as Trial Defendants," 27 Law and Hum. Behav. 333, 335 (2003). *See also*, Mary Sue Backus, "Achieving Fundamental Fairness for Oklahoma's Juveniles: The Role for Competency in Juvenile Proceedings," 65 Okla. L. Rev. 41, 44 (2012) ("In order to be competent, defendants must be able to: (1) consult with defense counsel; (2) otherwise assist with their defense; and, (3) have a rational and factual understanding of the proceedings."); David R. Katner, "Eliminating the Competency Presumption in Juvenile Delinquency Cases," 24 Cornell J. L. & Pub. Pol'y 403, 406 (2015) ("Surely any parent knows better and well understands the myriad differences between adult decision-making and adolescent decision-making. Yet, in the evolution of the juvenile court system, many of the same legal presumptions that govern adult matters have been matter-of-factly applied to juvenile matters."); Richard E. Redding, Lynda E. Frost, "Adjudicative Competence in the Modern Juvenile Court," 9 Va. J. Soc. Pol'y & L. 353, 355 (2001) ("As juvenile justice systems across the country become more punitive and courts hold that juveniles are entitled to adult-like levels of due process protection, the adjudicative competence of juveniles has increasingly come into question[.]"); Elizabeth Scott, "Developmental Incompetence, Due Process, and Juvenile Justice Policy," 83 N.C. L. Rev. 793 (2005); Jeffrey W. Stowers, Jr., "Misunderstood: A Juvenile's Ability to Be Competent Enough to Understand the Consequences of a Guilty Plea," 19 New Crim. L. Rev. 1, 3 (2016) (age, brain development, psychological developments, intelligence, and peer pressure are factors impairing a young offender's ability to comprehend that his or her actions have crossed into adult criminality); Christine A. Sullivan, "Statutory Reform in the Georgia Juvenile Court System: Juvenile Competency Issues Finally Addressed," 15 Ga.St.U. L. Rev. 879 (1999).

clearly define the method by which a juvenile's competency to understand the legal process may be examined, considered and protected.

In the instant case, however, we believe that while J.C.'s arguments are compelling, they have been rendered moot by the report from Sharpe Hospital opining that he has attained competency. J.C. argues that the circuit court should not have applied Section 3 to his juvenile case. On the one hand, if we reject J.C.'s argument and find Section 3 *does* apply, Section 3 says the circuit court retains jurisdiction until the "defendant attains competency to stand trial and the criminal charges reach resolution[.]" W.Va. Code 27-6A-3(h). If the report from Sharpe Hospital suggesting J.C. has attained competency is correct, strict application of Section 3 requires J.C. to face resolution of the State's juvenile petition. On the other hand, if Section 3 does not apply, as J.C. argues, then we must return the case to the circuit court for further proceedings to again assess J.C.'s competency and to resolve the allegations contained in the juvenile petition.[11] The legal questions raised by J.C.'s petition for appeal have been rendered moot because, in either instance, J.C. must be returned to the circuit court to resolve the allegations raised by the State's juvenile petition.

---

[11] This Court makes no judgment as to whether the report from Sharpe Hospital regarding J.C.'s competency is correct or is binding upon the circuit court. We also make no judgment regarding the future course of conduct that the circuit court should take in resolving the juvenile petition against J.C.

14

Whether a case has been rendered moot depends upon an examination of the particular facts of a case. "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496 (1969) (citation omitted). "[M]ootness may occur when the circumstances of the case change during the course of its pendency." *State ex rel. Bluestone Coal Corp. v. Mazzone*, 226 W.Va. 148, 155, 697 S.E.2d 740, 747 (2010).

A moot case generally cannot properly be considered on its merits. "Moot questions or abstract propositions, the decision of which would avail nothing in the determination of controverted rights of persons or of property, are not properly cognizable by a court." Syl. Pt. 1, *State ex rel. Lilly v. Carter*, 63 W.Va. 684, 60 S.E. 873 (1908). *Accord* Syl. Pt. 1, *Tynes v. Shore*, 117 W.Va. 355, 185 S.E. 845 (1936) ("Courts will not ordinarily decide a moot question.").

The issues raised on appeal by J.C. have been rendered moot. The host of questions remaining in this case are all better suited for the circuit court, within its juvenile jurisdiction, and not this Court.

### III. Conclusion

Accordingly, we dismiss J.C.'s appeal and remand the case to the circuit court for further proceedings.

Appeal dismissed as moot;
Case remanded for further proceedings.

15